No. 25-11055

## United States Court of Appeals
## for the Fifth Circuit

WINNIE JACKSON, JARRETT "JAY" JACKSON;
CELINA VASQUEZ;DUANE BRAXTON;
NADIA BHULAR; AMJAD BHULAR;
CHERYL MILLS SMITH; RICHARD CANADA,

*Plaintiffs-Appellants,*

v.

TARRANT COUNTY, TEXAS;
TARRANT COUNTY COMMISSIONERS COURT;
TIM O'HARE, IN HIS OFFICIAL CAPACITY AS
TARRANT COUNTYJUDGE,

*Defendants-Appellees.*

On appeal from the United States District
Court for the Northern District of Texas
USDC 4:25-CV-00587-O

## BRIEF OF PLAINTIFFS-APPELLANTS

Mark P. Gaber
MARK P. GABER PLLC
P.O. Box 34481
Washington, DC 20043

George (Tex) Quesada
Sean J. McCaffity
SOMMERMAN, MCCAFFITY,
QUESADA & GEISLER, L.L.P .
3811 Turtle Creek Blvd, Ste. 1400
Dallas, TX 75219

Chad W. Dunn
BRAZIL & DUNN, LLP
1900 Pearl Street
Austin, TX 78705

Danielle Lang
LANG LEGAL PLLC
6321 Ridge Avenue
Philadelphia, PA 19128

Jesse Gaines
LAW OFFICE OF JESSE L. GAINES
P.O. Box 50093
Fort Worth, TX 76102

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualifications or recusal.

| **Appellants** | **Counsel for Appellants** |
|---|---|
| Winnie Jackson<br>Jarrett "Jay" Jackson<br>Celina Vasquez<br>Duane Braxton<br>Nadia Bhular<br>Amjad Bhular<br>Cheryl Mills-Smith<br>Richard Canada | Chad W. Dunn<br>George (Tex) Quesada<br>Sean J. McCaffity<br>Jesse Gaines<br>Mark P. Gaber<br>Danielle Lang |
| **Appellees** | **Counsel for Appellees** |
| Tarrant County, Texas<br>Tarrant County Commissioners Court<br>Tim O'Hare, in his official capacity as<br>Tarrant County Judge | Joseph M. Nixon<br>Stephen Andrew Lund<br>Katherine Elizabeth Owens<br>Omar Jose Famada<br>John Christian Adams<br>Kaylan Phillips |

*/s/ Chad W. Dunn*
Chad W. Dunn

## STATEMENT REGARDING ORAL ARGUMENT

This case raises critical questions about the bounds of legislators' authority to target voters and delay their access to the franchise by an entire election cycle based on race or viewpoint. Given the weight of the issues in this case, Plaintiffs-Appellants (hereinafter "Plaintiffs") request oral argument. This Court has scheduled oral argument for October 27, 2025 at 10:00 am.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ......................................................... ii

STATEMENT REGARDING ORAL ARGUMENT ............................................... iii

TABLE OF CONTENTS ..................................................................................... iv

TABLE OF AUTHORITIES ................................................................................... v

JURISDICTIONAL STATEMENT ......................................................................... 1

STATEMENT OF THE ISSUES ............................................................................ 2

STATEMENT OF THE CASE .............................................................................. 3

SUMMARY OF ARGUMENT ............................................................................ 10

STANDARD OF REVIEW ................................................................................. 13

ARGUMENT ..................................................................................................... 14

    I.    Plaintiffs are Likely to Succeed on the Merits of Their Claims Challenging Their 2026 Disenfranchisement..................................................................... 14

        A.    Map 7 Unnecessarily and Discriminatorily Disenfranchises Over 150,000 Tarrant County Residents for an Entire Election Cycle...................................... 14

        B.    Map 7 Unconstitutionally Targets Voters for Disenfranchisement Based on Race. .......................................................................................................... 24

            a.    The Intentional Race Discrimination Standard Applies. ........................ 24

            b.    Plaintiffs' direct and circumstantial evidence establishes intentional discrimination. ......................................................................................... 28

        C.    Map 7 Unconstitutionally Targets Voters for Disenfranchisement Based on Viewpoint. ................................................................................................. 36

    II.    Plaintiffs Will Sufferable Irreparable Injury. ............................................. 39

    III.    The Balance of Equities Favors Plaintiffs................................................. 40

CONCLUSION ................................................................................................... 41

CERTIFICATE OF SERVICE ............................................................................. 43

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS........... 44

# TABLE OF AUTHORITIES

## Constitutional Provisions

Tex. Const. art. 16 ...........................................................................................3

Tex. Const. art. 5, § 18(b)...........................................................................3, 20

Tex. Const. art. 5, § 18(d) ...............................................................................3

Tex. Const. art. § 64 .......................................................................................20

U.S. Const. amend. I, XIV § 1 .......................................................................40

U.S. Const. amend. XV § 1 ............................................................................40

## Cases

*ACLU of Ohio, Inc. v. Taft,*
   385 F.3d 641 (6th Cir. 2004) ......................................................................16

*Alexander v. S. Carolina State Conf. of NAACP,*
   602 U.S. 1 (2024) .................................................................................. 26, 30

*Anderson v. Celebrezze,*
   460 U.S. 780 (1983) ...................................................................... 17, 18, 38

*Anibowei v. Morgan,*
   70 F.4th 898 (5th Cir. 2023) ......................................................................14

*Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n,*
   576 U.S. 787 (2015).....................................................................................23

*Barnett v. Boyle,*
   250 N.W.2d 635 (Neb. 1977) .....................................................................20

*Bonas v. Town of Smithfield,*
   265 F.3d 69 (1st Cir. 2001).........................................................................16

*Brnovich v. Democratic National Committee,*
   594 U.S. 647 (2021).....................................................................................33

*BST Holdings v. OSHA,*
   17 F.4th 604 (5th Cir. 2021) ................................................................. 40, 41

*Burdick v. Takushi,*
   504 U.S. 428 (1992) .............................................................................. 17, 18

*Byrum v. Landreth,*
   566 F.3d 442 (5th Cir. 2009) ......................................................................14

*Carrington v. Rash,*
   380 U.S. 89 (1965) ............................................................................... 12, 38

*Charles H. Wesley Educ. Fdn., Inc. v. Cox,*
   408 F.3d 1349 (11th Cir. 2005) ..................................................................41

*Cipriano v. City of Houma*,
  395 U.S. 701 (1969) ............................................................40
*Deerfield Med. Center v. City of Deerfield Beach*,
  661 F. 2d 3286 (5th Cir. Unit B Nov. 1981) ........................40
*DeLeon v. Abbott*,
  791 F.3d 619 (5th Cir. 2015) ..............................................40
*DeLeon v. Perry*,
  975 F. Supp. 2d 632 (W.D. Tex. 2014) ..........................40, 41
*Dollinger v. Jefferson Cnty. Comm'rs Ct.*,
  335 F. Supp. 340 (E.D. Tex. 1971).......................................19
*Donatelli v. Mitchell*,
  2 F.3d 508 (3d Cir. 1993) ....................................... 21, 24, 25
*Duncan v. Poythress*,
  657 F.2d 691 (5th Cir. 1981) ...............................................16
*Dunn v. Blumstein*,
  405 U.S. 330 (1972) ................................................ 16, 17, 40
*Elrod v. Burns*,
  347 U.S. 373 (1976)..............................................................40
*Free Speech Coalition v. Paxton*,
  95 F.4th 263 (5th Cir. 2024) ................................................14
*G & V Lounge, Inc. v. Michigan Liquor Control Commission*,
  23 F.3d 1071 (6th Cir. 1994) ...............................................41
*In re Khanoyan*,
  637 S.W.3d (Tex. 2022).........................................................23
*Ingebretsen v. Jackson Public School Dist.*,
  88 F.3d 274 (5th Cir. 1996) .................................................41
*League of United Latin Am. Citizens v. Abbott*,
  601 F. Supp. 3d 147 (W.D. Tex. 2022) ...................... 26, 33, 34
*League of United Latin Am. Citizens v. Perry*,
  548 U.S. 399 (2006)..............................................................32
*League of Women Voters of N. Carolina v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) .........................................18, 41
*Legislature v. Reinecke*,
  516 P.2d 6 (Cal. 1973).........................................................20
*Mader v. Crowell*,
  498 F. Supp. 226 (M.D. Tenn. 1980)....................................21
*Mayor & Council of Tucson v. Royal*,
  510 P.2d 394 (Ariz. App. Div. 2 1973) ................................19
*Miller v. Johnson*,
  515 U.S. 900 (1995)..............................................................31

*Moore v. Brown*,
  868 F.3d 398 (5th Cir. 2017) ...............................................................14

*Norman v. Reed*,
  502 U.S. 279 (1992) .............................................................................17

*Pate v. El Paso Cnty.*,
  337 F. Supp. 95 (W.D. Tex. 1970) .......................................................21

*Pate v. El Paso Cnty.*,
  400 U.S. 806 (1970) .............................................................................21

*Pereira v. Town of N. Hampstead*,
  682 F. Supp. 3d 234 (E.D.N.Y. 2023) .................................................21

*Perez v. Abbott*,
  253 F. Supp. 3d 864 (W.D. Tex. 2017) .......................................... 29, 34

*Personnel Adm'r of Mass v. Feeney*,
  442 U.S. 256 (1979) .............................................................................30

*Petteway v. Galveston County*,
  111 F.4th 596 (5th Cir. 2024) ..............................................................35

*Petteway v. Galveston County*,
  698 F. Supp. 3d 952 (S.D. Tex. 2023) ................................................35

*Republican Party of Oregon v. Keisling*,
  959 F.2d 144 (9th Cir. 1992) .............................................. 21, 22, 24, 25

*Reynolds v. Sims*,
  377 U.S. 533 (1964) .............................................................................16

*Rogers v. Lodge*,
  458 U.S. 613 (1982) .............................................................................28

*Rucho v. Common Cause*,
  588 U.S. 684 (2019) ...................................................................... 13, 24, 39

*Shaw v. Reno*,
  509 U.S. 630 (1993) ...................................................................... 31, 32

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023) .............................................................................32

*United States v. Brown*,
  561 F.3d 420 (5th Cir. 2009) ...............................................................26

*Veasey v. Abbott*,
  830 F.3d 216 (5th Cir. 2016) .......................................... 26, 28, 29, 37

*Vidal v. Elster*,
  602 U.S. 286 (2024) .............................................................................38

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
  429 U.S. 252 (1977) ...................................................................... 28, 29, 32

*Washington v. Davis*,
  426 U.S. 229 (1976) .............................................................................28

*Wesberry v. Sanders*,
  376 U.S. 1 (1964) ................................................................................15

## JURISDICTIONAL STATEMENT

Plaintiffs filed their complaint on June 4, 2025, alleging violations of their rights under, as relevant here, the First, Fourteenth, and Fifteenth Amendments pursuant to 42 U.S.C. § 1983. ROA.14. The district court possessed subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1357. Plaintiffs moved for a preliminary injunction on June 27, 2025. ROA.141. Defendants moved to dismiss on August 1, 2025. ROA.424. On September 12, 2025, the district court denied Plaintiffs' motion for preliminary injunction in its entirety and granted Defendants' motion to dismiss in part. ROA.652. Plaintiffs timely appealed on September 15, 2025. ROA.675.

Jurisdiction in this Court to review the denial of Plaintiffs' motion for preliminary injunction is proper under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1.    Are Plaintiffs likely to succeed on the merits of their burden on the right to vote claim that the Tarrant County Commissioners Court violated their First and Fourteenth Amendment rights by adopting a mid-decade redistricting plan that disenfranchises them for the 2026 election without any legitimate governmental justification and, instead, on the basis of their race and viewpoint?

2.    Are Plaintiffs likely to succeed on the merits of their intentional discrimination claim under the Fourteenth and Fifteenth Amendments that the Commissioners Court adopted a plan that disenfranchises them for the 2026 election on the basis of their race when the official casting the deciding vote publicly explained it by discussing his view that "Black voters" choose the wrong candidates?

3.    Are Plaintiffs likely to succeed on the merits of their First Amendment claim that the Commissioners Court unlawfully disenfranchised them for the 2026 election based on their viewpoint where Defendants admit they were engaged in an "an unambiguous, explicit and unabashed effort to increase Republican power and decrease Democratic power on the Commissioners Court"?

4.    Did the district court err in denying Plaintiffs' motion for preliminary injunction?

2

## STATEMENT OF THE CASE

Under the Texas Constitution, Commissioners Courts—which consist of four commissioners elected from precincts and the County Judge—are the governing body of Texas counties. Tex. Const. art. 5, § 18(b). Commissioners are elected in staggered elections and they "shall hold [] office for four years and until [a] successor shall be elected and qualified." *Id.*; *see also* Tex. Const. art. 16, § 64.[1]

On April 2, 2025, the Tarrant County Commissioners Court voted 3-2 to approve a contract with the Virginia-based Public Interest Legal Foundation ("PILF") to assist in conducting a mid-decade redistricting of the commissioner precincts. Pls.' App. to Mot. for Preliminary Injunction, Decl. of Dr. Cortina, ROA.191.

This redistricting process was not necessitated by population growth. Following the 2020 Census, the Commissioners Court underwent a full redistricting process. ROA.188-191. As a result of that process, the Commissioners Court voted to approve the existing precinct boundaries ("Benchmark Map) because, while Tarrant County saw substantial population growth, that growth was relatively even across the

---

[1] The Texas Constitution provides that even if redistricting causes commissioners to no longer reside in the precinct from which they were elected, commissioners "shall serve in the precinct to which each was elected or appointed for the entire term to which each was elected or appointed, even though the change in boundaries places the person's residence outside the precinct for which he was elected or appointed." Tex. Const. art. 5, § 18(d).

county such that the Benchmark Map had only a 1.97% overall population deviation (far below the constitutional threshold). ROA.189-191.

Rather, the redistricting process was for the avowed purpose of dismantling the power of Black voters and silencing them because they vote for Democrats. On the day he cast the deciding vote on the new plan, Tarrant County Judge Tim O'Hare specifically commented on the redistricting in a television interview as follows: "The policies of Democrats continue to fail Black people over and over and over, but many of them keep voting them in. It's time for people of all races to understand the Democrats are a lost party, they are a radical party, it's time for them to get on board with us and we'll welcome them with open arms." ROA.194. In these proceedings, Defendants have taken the position that the new Map was adopted as part of "an unambiguous, explicit and unabashed effort to increase Republican power and decrease Democratic power on the Commissioners Court." Defs.' Mem. in Support of Its Mot. to Dismiss, ROA.489. But Judge O'Hare's unambiguous, explicit and unabashed explanation makes clear that the effort was *specifically* aimed at depriving *Black* voters because they tend to support Democrats.

To serve this racially motivated goal, the Commissioners Court engaged in a rushed and irregular process. The Commissioners Court did not adopt any neutral redistricting criteria; each of the public meetings on the process were held *before* the final map options were publicly released on the County's website; the attorneys that

led the process refused to address the public[2] and provided no written analysis; and the vote to adopt Map 7 occurred just days after it was released despite a prior commitment from Judge O'Hare to make the maps available for public consideration for at least two weeks before adoption. ROA.192-193. All this stands in stark contrast to the 2021 process that started with neutral criteria and involved more public input, including from the legal team, and ultimately opted to keep the Benchmark Map. ROA.188-191. Indeed, at the June 3, 2025 Commissioners meeting at which Map 7 was adopted, Republican Commissioner Manny Ramirez commented: "I will agree with what a lot of what folks have said. I think the process -- it had flaws. I think the process could have been a lot more comprehensive." ROA.194.

Before it was dismantled, the Benchmark Map contained two precincts with a majority of Black and Hispanic voters (Precincts 1 and 2) who were able to elect candidates of choice of those communities and two precincts with a majority of Anglo voters (Precincts 3 and 4) who elected candidates of choice for the Anglo community. ROA.183-185. When the Benchmark Map was initially configured, Precincts 2, 3,

---

[2] When Commissioner Simmons requested that PILF lawyers come to the meeting room and be available for questions in a public setting—something that Bickerstaff attorneys had done in prior cycles—Judge O'Hare responded that PILF had said they would not present publicly and "you don't have subpoena power to make them come out here." ROA.193. Shortly after, Judge O'Hare threatened to have all members of the public removed from the meeting if anyone made noise. ROA.193.

and 4 were all majority Anglo voter districts. ROA.111. Over time, due to population growth and natural demographic changes, Precinct 2 became a majority-minority district and in 2018, began to elect candidates of choice of the Black and Latino communities. ROA.112.[3]

On June 3, 2025, the Commissioners Court approved a mid-cycle redistricting plan—Map 7—that shifted substantial numbers of Black and Latino voters out of Precinct 2 into Precinct 1. The intentional result of this shift was to deprive Black and Latino voters of their current ability to elect candidates of their choice in Precinct 2 by packing those voters into a single majority-minority district, Precinct 1. The disfiguration of the precincts to serve the goal of injuring Black voters is plain:

|  |  |
|:---:|:---:|
| **Benchmark Plan[4]** | **Map 7** |
|  |  |

---

[3] Between the 2010 and 2020 Census, Tarrant County's population grew by over 300,000 persons. That growth was entirely among non-Anglo residents as the Anglo population decreased over this period. ROA.180.

[4] *See* Tarrant County Redistricting 2025,

The voting age population of those moved from even- to odd-numbered precincts is 153,581. ROA.181. The voters who are shifted from even-numbered precincts to odd-numbered precincts—including Plaintiffs Duane Braxton, Cheryl Mills-Smith, Richard Canada, Nadia Bhular, and Amjad Bhular—were last eligible to vote for commissioner in 2022 and, until the adoption of Map 7, had the right to vote for commissioner in the November 2026 election. Pls' Decls', ROA.384-393. Under Map 7, they are denied the right to vote for commissioner in 2026 and will instead not be able to vote for commissioner until November 2028—six years after they last cast ballots. *Id.* In other words, these voters lose an entire election cycle of representation by a Commissioner for whom they had the opportunity to vote.

Given the intentional shifting of Black and Latino voters from Precinct 2 (an even precinct) to Precinct 1 (odd), the plan has the intentional effect of disproportionately depriving these voters of an election cycle of voting for Commissioners Court. Demographically, the voting age population of Tarrant County as a whole is 46.9% Anglo, 17.9% Black, and 26.3% Latino. ROA.181. By contrast, just 25.7% of the voting age population shifted from an even- to an odd-numbered precinct is Anglo, 31.2% is Black, and 31.9% is Latino. *Id.* Thus, only 5.3% of Tarrant County's adult Anglo population (1 out of 20 Anglo adults) will be

---

https://www.tarrantcountytx.gov/redistricting.

denied the right to vote for commissioner in 2026, while 17.0% of the county's adult Black population (1 out of 6 Black adults) and 11.8% of the county's adult Latino population (1 out of 8 Latino adults) will be. *Id.*

Map 7 thus makes Black adults in Tarrant County between three and four times more likely than Anglo adults to be denied the right to vote for commissioner in 2026, and Latino adults between two and three times more likely than Anglo adults. ROA.182.

By voting patterns, Democrats are also disproportionately targeted by this disenfranchisement. While 46.7% of the county voted for the Democrat in the 2024 Presidential election, 62.7% of the population of disenfranchised voters did. *Id.*

On June 4, 2025—one day after the Commissioners Court adopted Map 7—Plaintiffs filed this lawsuit challenging the Map under Section 2 of the Voting Rights Act and the First, Fourteenth, and Fifteenth Amendments. ROA.14. They filed their amended complaint on June 17. ROA.65. Plaintiffs challenge both the 2026 disenfranchisement and the intentional vote dilution of Black and Latino voters achieved through the dismantling of Precinct 2. *Id.* On June 27, Plaintiffs' moved for a preliminary injunction on their claims and filed declarations and an expert report in support thereof. ROA.141; ROA.177. On the same day, they also moved to expedite the hearing to ensure the availability of timely relief, including appellate review, before the 2026 election. ROA.400. Plaintiffs specifically requested a district

court determination on their preliminary injunction motion by September 12. *Id.* Defendants moved to dismiss Plaintiffs' claims on August 1. ROA.424. In their response to Plaintiffs' preliminary injunction, Defendants attached no declarations, expert reports, or other evidence countering Plaintiffs' submissions.

On September 12, without holding an evidentiary hearing, the district court, Chief Judge Reed O'Connor, issued a memorandum opinion and order resolving both Plaintiffs' motion for preliminary injunction and Defendants' motion to dismiss. ROA.652. The district court denied Plaintiffs' motion for preliminary injunction in full and granted Defendants' motion to dismiss only as to Plaintiffs' First Amendment claims.

On September 15, Plaintiffs filed this appeal. ROA.675. In this appeal, Plaintiffs only seek review of the denial of the preliminary injunction with respect to their claims challenging the 2026 disenfranchisement resulting from Map 7. This appeal does not address Plaintiffs' intentional vote dilution claims, which remain pending in the district court below.

## SUMMARY OF ARGUMENT

The Constitution safeguards the right to vote—a right that is preservative of all other rights—and protects Americans from government action that punishes them for their race or their political viewpoint. Tarrant County's brazen mid-decade decision to scramble its maps—which has the effect of disenfranchising over 150,000 Tarrant County residents who would otherwise be headed to the polls in 2026 to vote for their Commissioner—tramples on each of these protections. Plaintiffs established their likelihood of success on the merits on their claims challenging this disenfranchisement and are entitled to a preliminary injunction. If this Court does not act now to protect their right to vote in 2026, the harm will be irreparable.

*First,* the adoption of Map 7 fails under a straightforward application of the Supreme Court's right to vote jurisprudence, which requires courts to weigh the severity of the burden against a state's interests in the restriction and applies strict scrutiny whenever the burden on the right to vote is severe or discriminatory. The burden on the right to vote is both severe—the complete loss of the franchise for one election cycle—and discriminatory. Defendants' own words—both on television and in this case—together establish that voters were targeted based on race and viewpoint. Meanwhile, there is no legitimate justification for this mid-decade redistricting. Unlike every other case addressing the disenfranchisement that occurs at the intersection of staggered elections and redistricting, there was nothing inevitable here:

10

the redistricting was not for the purpose of equalizing population. Those cases reaffirm that the Constitution does not countenance discriminatory disenfranchisement or disenfranchisement without justification.

*Second*, the disenfranchisement arising out of the adoption of Map 7 was intentionally racially discriminatory. Judge O'Hare's explained the adoption of Map 7 this way: "The policies of Democrats continue to fail Black people over and over and over, but many of them keep voting them in. It's time for people of all races to understand the Democrats are a lost party, they are a radical party, it's time for them to get on board with us and we'll welcome them with open arms." ROA.194. This direct evidence is only bolstered by the circumstantial evidence. Evidence under every *Arlington Heights* factor supports an inference of racial discrimination. The district court only reached the opposite conclusion by (1) subjecting this claim to the racial gerrymandering predominance standard rather than the intentional discrimination standard; (2) excusing the use of race as a proxy of politics, contrary to decades of Supreme Court precedent; and (3) dismissing the circumstantial evidence.

*Third*, the 2026 disenfranchisement is unconstitutional viewpoint discrimination. The Supreme Court has repeatedly held that "[f]encing out from the franchise a sector of the population because of the way they may vote is constitutionally impermissible." *Carrington v. Rash*, 380 U.S. 89, 94 (1965). Yet, that is the express purpose of Defendants' actions. The district court concluded that *Rucho*

11

*v. Common Cause*, 588 U.S. 684 (2019) immunizes this action. But, of course, *Rucho*, did not excuse *disenfranchisement* based on partisan viewpoint. It held that partisan vote *dilution* claims are not justiciable because they are not judicially manageable. It is judicially manageable to say—as the Supreme Court has—that officials can never deprive voters of the right to vote in an election based on their political views. In a democracy, that is the only viable answer.

## STANDARD OF REVIEW

A district court's grant or denial of a preliminary injunction is reviewed for abuse of discretion. *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023). "Factual findings are reviewed for clear error, while legal conclusions are reviewed de novo." *Moore v. Brown*, 868 F.3d 398, 403 (5th Cir. 2017) (per curiam). And "when a preliminary injunction turns on a mixed question of law and fact, it, too, is reviewed *de novo*." *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

A preliminary injunction should be granted when the moving party establishes the following four factors:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Free Speech Coalition v. Paxton*, 95 F.4th 263, 269 (5th Cir. 2024).

**ARGUMENT**

I.    **Plaintiffs are Likely to Succeed on the Merits of Their Claims Challenging Their 2026 Disenfranchisement.**

   **A. Map 7 Unnecessarily and Discriminatorily Disenfranchises Over 150,000 Tarrant County Residents for an Entire Election Cycle.**

Absent the Commissioners Court's sudden and unnecessary redistricting this year, Plaintiffs Duane Braxton, Nadia Bhular, Amjad Bhular, Cheryl Mill-Smith, and Richard Canada were set to vote for their county commissioner next year. Pls' Decls', ROA.384-393. But now, due to the adoption of Map 7, they will not be able to vote in 2026. *Id.* Instead, they and over 150,000 other Tarrant County voting-age residents will have to wait another full election cycle (6 years since their last vote for commissioner) to cast their first vote in their new district. ROA.181. In the meantime, they will be represented by a commissioner they never had an opportunity to vote for (or against). In other words, they will be disenfranchised with respect to their representation on the Commissioners Court for two years.

This presents a profound constitutional injury: it is the loss of the right to vote in an election cycle. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). The voters subject to this disenfranchisement in 2026 have certainly had their right to vote "undermined." *Id.*

14

And it is no answer to disenfranchisement for *this* election that these voters will be able to vote in a *future* different election. Just as it was no answer in *Dunn v. Blumstein*, the landmark case striking down durational residence laws, that a voter unable to meet a durational residency requirement *this* election could vote in a future one: "Durational residence requirements completely bar from voting all residents not meeting the fixed durational standards. By denying some citizens the right to vote, such laws deprive them of 'a fundamental political right, . . . preservative of all rights.'" 405 U.S. 330, 336 (quoting *Reynolds v. Sims*, 377 U.S. 533, 562 (1964)); *C.f., ACLU of Ohio, Inc. v. Taft*, 385 F.3d 641, 650 (6th Cir. 2004) (holding that the failure to call an immediate special election—resulting in only six months without a representative in the district—"denied ACLU members the rights to vote and to equal protection in violation of the Fourteenth Amendment"); *Bonas v. Town of Smithfield*, 265 F.3d 69, 75 (1st Cir. 2001) (finding an unlawful delay of elections by one year would "work a total and complete disenfranchisement of the electorate"); *Duncan v. Poythress*, 657 F.2d 691 (5th Cir. 1981) (holding that Georgia's unlawful appointment of a replacement for a Georgia Supreme Court judgeship, rather than holding a required special election, denied voters' constitutional rights).

Nor is this infringement on the right to vote born equally by Tarrant County residents. *Contra* ROA.502 (arguing the burden is one "shared by the entire electorate"). As a result of Map 7, some voters will vote on a four-year cycle, others

15

will vote twice in two years, and over 150,000 will be forced to wait six years. That injury is a large one, with certain voters being required to wait 50% or 150% longer than others to vote.

Such an unequal doling out of the right to vote wholesale must be justified by a compelling state interest. *See Dunn v. Blumstein*, 405 US. 330, 337 (1972) (if a challenged act "grants the right to vote to some citizens and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest" (internal quotation marks omitted)); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) ("[W]hen [the rights of voters] are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling interest[.]'" (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)) (subjecting only "reasonable, *nondiscriminatory* restrictions" on the right to vote to lower scrutiny (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) (emphasis added)).

And even if the disenfranchisement is not subject to strict scrutiny, under the standard rubric for right to vote claims under the First and Fourteenth Amendment, courts must:

> weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

16

*Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). Given the magnitude of the injury and the lack of *any* neutral justification, *see infra*, Plaintiffs prevail under any application of this test.

Both Defendants and the district court minimize this loss of the right to vote for an election cycle by recasting it as "temporary" or merely a "delay." *See, e.g.,* Mem. Op. & Order, ROA.657; Defs. Mem. in Support of Mot. to Dismiss, ROA.499.[5] But once an election occurs, the injury of exclusion is complete. *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("[O]nce the election occurs, there can be no do-over and no redress."). After 2026, Plaintiffs will have permanently lost the opportunity to participate in the selection of their representative for that election cycle.

And Defendants' position would, taken to its logical conclusion, permit *permanent* disenfranchisement. Under that framework, the County could, after the 2026 election, pass a new map that once again shifts disfavored voters resulting in their "temporary" disenfranchisement. And so on. If the County repeated this exercise

---

[5] The district court based its conclusion that "the redistricting does not burden the right to vote," ROA.662, on the outcomes in other cases addressing the intersection of staggered elections and redistricting. But, as described, *infra*, those cases do not stand for the proposition that there is no burden but rather, absent discrimination and when balanced against the competing demand to equalize population, that burden is constitutional. Those circumstances are not present here.

every four years, it could forever fence out Precinct 1's current voters—whose race and political viewpoints the County disfavors—from voting for commissioners. Semantics cannot defeat the substantial burden of having one's right to vote be put off for two (or more) years.[6]

    Prior cases concerning the disenfranchisement that occurs around redistricting in jurisdictions using staggered terms are not to the contrary. Rather, those courts weigh the competing legitimate public interests—including the state interest in using staggered elections and its constitutional duty to redistrict to address malapportionment—and, *where there is no discriminatory application of the disenfranchisement*, find those interests sufficient to justify the burden.[7]

---

[6] Defendants' wordplay is at work throughout their district court briefing. For example, they argue that there is no "restriction on the equal opportunity to vote" here because "Plaintiffs can still vote in every election (national, State, or local) for which they are eligible in 2026[.]" ROA.502. But of course, the Plaintiff in *Dunn* was able to vote in every election "for which they [were] eligible" too—the problem is the government's engineering of eligibility to deprive disfavored voters of access to the ballot box.

[7] When undertaking this weighing, at least two courts have found disenfranchisement caused by redistricting staggered election seats to violate the Constitution. In *Mayor & Council of Tucson v. Royal,* an Arizona court found redistricting plan unlawful when it shifted (and thus disenfranchised) far more voters than was necessary to equalize population. 510 P.2d 394, 400 (Ariz. App. Div. 2 1973); *see also Dollinger v. Jefferson Cnty. Comm'rs Ct.*, 335 F. Supp. 340, 343 (E.D. Tex. 1971) ("We believe the equities favor ordering an election for Precinct 2 in that less than 50% of the residents of this precinct have had an opportunity to express a choice in regard to their elected precinct official[.]").

    While the courts in those cases ordered special elections, here the most appropriate remedy is enjoining implementation of Map 7. Federal courts must

For example, the California Supreme Court held that the State had an interest in "stability and continuity in the Senate as a desirable goal which is reasonably promoted by" staggered terms and that "[t]o obviate the inequality would substantially interfere with the orderly operation of the four-year staggered terms system after every reapportionment." *Legislature v. Reinecke*, 516 P.2d 6, 12 (Cal. 1973). Since "[t]he inequalities among groups of electors are the inevitable byproduct of reapportioning a legislative body whose members are elected to staggered four-years terms," the California Supreme Court explained it was "not free to obviate them *unless they constitute invidious discrimination* violative of the equal protection clause of the fourteenth amendment." *Id.* (emphasis added). Likewise, the Nebraska Supreme Court allowed the tiered introduction of staggered terms—which resulted in a similar impact—both because the state had a "legitimate purpose in providing for continuity in the membership of the Omaha School Board" and the law made "no invidious discrimination between classes of electors." *Barnett v. Boyle*, 250 N.W.2d 635, 638 (Neb. 1977). This is a universal principle. *See, e.g.*, *Republican Party of Oregon v.*

---

minimize their intrusion on state policies in remedying federal constitutional violations. It is the state policy of Texas—enshrined in the Texas Constitution—that commissioners serve four-year terms and that redistricting cannot alter those terms. *See* Tex. Const. arts. 16 § 64 & art. 5, § 18(d). Map 7 is a mid-decade redraw advanced by a *county* without any population equality justification and instead to advance racial and partisan goals. In this circumstance, the least intrusive remedy is enjoining implementation of Map 7.

*Keisling*, 959 F.2d 144, 145-46 (9th Cir. 1992) (observing that disenfranchisement is the "inevitable consequence[] of redistricting following the [] census" and holding that temporary disenfranchisement does not violate the Fourteenth Amendment unless it "unduly burden[s] a particular group"); *Donatelli v. Mitchell*, 2 F.3d 508, 514-18 (3d Cir. 1993) (weighing that the state was "constitutionally required to" reapportion and that "such temporary disenfranchisement is inevitable, at least to some degree, whenever a reapportionment is combined with a staggered system of elections" and holding such an outcome constitutional where it was "not targeted at a discrete group of voters based on some personal characteristic"); *Pate v. El Paso Cnty.*, 337 F. Supp. 95, 96-98 (W.D. Tex. 1970), summarily aff'd, 400 U.S. 806 (1970) (rejecting challenge to Texas Constitution's provision of staggered terms for county commissioners because staggered terms "insure[] that the commissioners court have some continuity in its membership and experience, thereby providing for more efficient and effective county government," redistricting was necessitated by population deviation and there was "no arbitrary and invidious discrimination" in who was disenfranchised following redistricting); *Mader v. Crowell*, 498 F. Supp. 226, 231 (M.D. Tenn. 1980) (finding no violation where disenfranchisement was in response to court order to equalize districts and there was "no evidence that the General Assembly made these shifts for invidious or discriminatory purposes"); *Pereira v. Town of N. Hampstead*, 682 F. Supp. 3d 234, 244 n.9, 246-47 (E.D.N.Y. 2023)

(denying plaintiff's claim because he experienced a "temporary disenfranchisement that occurs when reapportionment is combined with a staggered system of elections," the Town Defendants "did not voluntarily decide to redistrict," and the differential treatment was not based on a suspect classification).

Two principles emerge from these cases. First, the state must put forward legitimate state interests to justify the disenfranchisement. And second, there must not be any invidious discrimination in its application.[8]

Defendants fail on both scores.

What Tarrant County has done here is far afield from anything in the cases described above. Unlike *all* those cases, the disenfranchisement at issue in this case is *not* the "inevitable consequence of redistricting following the [] census," *Keisling*, 959 F.2d at 145-46, or in the case of *Barnett*, the inevitable consequence of the introduction of staggered elections. It is undisputed that the Benchmark Plan complied with one person, one vote and, for that matter, all other neutral redistricting criteria Tarrant County had previously established. ROA.186-191.

There is therefore no need to balance two competing federal constitutional concerns—enforcement of the one-person, one-vote requirement on the one hand

---

[8] The district court acknowledged that these cases "agree that temporary disenfranchisement would be unconstitutional—or at least subject to heightened scrutiny—if it was the result of invidious discrimination." ROA.658.

and federal constitutional concerns regarding disenfranchisement on the other. And Plaintiffs' claims do not challenge Texas's ability to employ staggered elections as a general matter. Nor is there any other proffered justification—such as making "maintenance of bridges and roads within a precinct . . . [more] efficient and effective." *In re Khanoyan*, 637 S.W.3d at 768 n.10—necessitating the disenfranchisement of over 150,000 residents beyond "an unambiguous, explicit and unabashed effort to increase Republican power." Defs. Mem. in Support of Mot. to Dismiss, ROA.489.[9] But a desire to engage in partisan gerrymandering is an insufficient governmental interest to warrant disenfranchising voters. *See, e.g.*, *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 791 (2015) ("Partisan gerrymanders . . . are incompatible with democratic principles." (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 292 (2004) (plurality)) (cleaned up). While federal courts lack Article III jurisdiction to enjoin a map based on a partisan vote dilution theory, *see Rucho v. Common Cause*, 588 U.S. 684 (2019), political subdivisions cannot

---

[9] The district court references Defendants' passing argument that the Benchmark Map was "constitutionally suspect." ROA.665. This assertion has no support in law or fact. During the only presentation by Defendants' redistricting lawyer Mr. Nixon to the Commission, when asked if there was anything illegal about the existing map, he responded "that is not anything I've been hired to provide an answer to." Tarrant County Comm'rs Court Meeting Video at 1:47:10 (May 6, 2025), https://prod-agendamanagement-publicportal.azurewebsites.us/HtmlAgenda/e86a9f86-cfcb-41c5-f5c2-08dd617d51b0.

assert an interest in partisan gerrymandering to justify *disenfranchising* voters.[10] *See infra* I.C.

And, likewise, unlike *all* the cases described above, the disenfranchisement was undoubtedly "targeted at a discrete group of voters based on some personal characteristic," *Donatelli*, 2 F.3d at 514, and "unduly burden[s] a particular group," *Keisling*, 959 F.2d at 145-46. Defendants' own words—both on television and in this case—together establish that voters were targeted based on race and viewpoint. *See* ROA.194; ROA.489. And that targeting was effective. Black adults in Tarrant County are between three and four times more likely than Anglo adults to be denied the right to vote for commissioner in 2026, and Latino adults are between two and three times more likely than Anglo adults. ROA.181-182.

This case is novel. But that is only because no entity, to Plaintiffs' knowledge, has engaged in such a brazenly discriminatory and unjustified scheme to disenfranchise voters for a full election cycle. But the legal theory is anything but

---

[10] The district court concluded that because redistricting is "an inherently governmental prerogative," the Defendants' interest in drawing lines "for partisan ends" is "presumptively a strong state interest." ROA.664. This is circular. Yes, redistricting is a state legislative power. But when courts analyze the governmental interests supporting a state action that curtails a fundamental right, they are almost always analyzing an action within the state's delegated powers. The state's interest in the power itself cannot be the answer; the question is towards what purpose has the state used that power. Notably, the district court cites no authority for the position that discriminating against disfavored voters based on their politics is a compelling state interest that can justify disenfranchisement.

novel. The burden on the right to vote is severe. The burden is discriminatory. And Defendants have put forward no neutral or legitimate justification but rather, have admitted a discriminatory purpose. Plaintiffs have established their right to relief under the First and Fourteenth Amendments on a straightforward burden on the right to vote theory.[11]

### B. Map 7 Unconstitutionally Targets Voters for Disenfranchisement Based on Race.

#### a. The Intentional Race Discrimination Standard Applies.

Map 7 must be preliminarily enjoined for yet another black letter constitutional reason: both direct and circumstantial evidence demonstrate that the Map 7 was adopted, at least in part, to harm Black voters and diminish their political power. Protection against such intentional acts of discrimination is the heartland of the Fourteenth and Fifteenth Amendments.

---

[11] The district court did not apply the standard *Anderson-Burdick* framework for right to vote claims. *See supra* at 16-17. Rather, the district court dismissed this right to vote claim out-of-hand based on two out-of-circuit cases addressing the more typical temporary disenfranchisement after constitutionally required reapportionment and finding there is no "first amendment right to vote for state representatives on a particular schedule." ROA.667 (quoting *Keisling*, 959 F.2d at 145 and citing *Donatelli*, 2 F.3d at 515 n. 10). But as discussed *supra*, neither of those cases involved viewpoint discrimination, which heightens the First Amendment harms at stake. Moreover, both *Keisling* (1992) and *Donatelli* (1993) were decided close in time to *Burdick v. Takushi* (1992) and therefore, before the *Anderson-Burdick* standard was well-established as the overarching standard for right to vote claims.

The district court failed to apply the correct standard to this claim and so came to the incorrect answer.

Plaintiffs allege that Defendants *intentionally* subjected a disproportionate number of Black and Latino voters to disenfranchisement in the 2026 election cycle as part of a scheme to minimize their political power. This type of intentional discrimination claim has a familiar standard—assessing the direct evidence and, for circumstantial evidence, assessing the *Arlington Heights* factors—not the racial gerrymandering predominance standard. A plaintiff alleging intentional racial discrimination need not show that racial considerations were the predominant motivation of the government action, *see Alexander v. S. Carolina State Conf. of NAACP*, 602 U.S. 1, 38-39 (2024) (noting that the two claims—intentional discrimination vs. racial gerrymandering—are "analytically distinct" (cleaned up)). Rather, as this Court has explained, "'racial discrimination need only be one purpose, and not even a primary purpose,' of an official action for a violation to occur." *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016) (en banc) (quoting *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009)); *see League of United Latin Am. Citizens v. Abbott*, 601 F. Supp. 3d 147, 161-62 (W.D. Tex. 2022) ("LULAC") ("Plaintiffs may show intentional vote dilution merely by establishing that race was part of Defendants' redistricting calculus, but to show racial gerrymandering they must go further and prove that race predominated over other considerations such as

25

partisanship.").

Notwithstanding this distinction—and that the harms in racial gerrymandering cases (being placed in a district based on your race) and the harm here (disenfranchisement in 2026) are entirely inapposite—the district court applied the racial gerrymandering test. ROA.667. The district court found that the racial gerrymandering test must apply because Plaintiffs disclaimed making an intentional vote *dilution* claim. *Id.* But the district court missed the critical distinction: between the mere *consideration* of race in redistricting, which gives rise to a racial gerrymandering claim, and *intentional racial discrimination* aimed at "minimiz[ing] or cancel[ing] out the voting potential of racial or ethnic minorities." *Alexander*, 602 U.S. at 38. While it is true that this claim is about disenfranchisement not vote dilution, it is an intentional discrimination claim that the mapmakers were attempting to "minimize or cancel out the voting potential of racial or ethnic minorities." *Id.* That is what matters. It would be beyond bizarre to suggest that mapmakers are free to act *intentionally* to harm Black voters so long as that wasn't their "predominant" goal. Yet, that is precisely what the district court concluded. The Fourteenth and Fifteenth Amendments prohibit intentional acts to diminish Black voters' political power, even if lawmakers have other goals too.

"[D]iscriminatory intent need not be proved by direct evidence." *Rogers v. Lodge*, 458 U.S. 613, 618 (1982). As the *en banc* Fifth Circuit has explained in

holding that circumstantial evidence can prove intentional discrimination,

> [i]n this day and age we rarely have legislators announcing an intent to discriminate based upon race, whether in public speeches or private correspondence. To require direct evidence of intent would essentially give legislatures free rein to racially discriminate so long as they do not overtly state discrimination as their purpose and so long as they proffer a seemingly neutral reason for their actions. This approach would ignore the reality that neutral reasons can and do mask racial intent, a fact we have recognized in other contexts that allow for circumstantial evidence.

*Veasey*, 830 F.3d at 230.

As the Supreme Court has explained, "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence as may be available." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977). "The impact of the official action[,] whether it 'bears more heavily on one race than another,' may provide an important starting point." *Id.* (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). From there, the Court "set out five non-exhaustive factors to determine whether a particular decision was made with a discriminatory purpose:" (1) "the historical background of the decision," (2) "the specific sequence of events leading up to the decision," (3) "departures from the normal procedural sequence," (4) "substantive departures," and (5) "legislative history, especially where there are contemporary statements by members of the decision-making body." *Veasey*, 830 F.3d at 231; *Arlington Heights*, 429 U.S. at

267-68. Plaintiffs claiming intentional discrimination "need not prove race-based hatred or outright racism, or that any particular legislator harbored racial animosity or ill-will toward minorities because of their race." *Perez v. Abbott*, 253 F. Supp. 3d 864, 948 (W.D. Tex. 2017).

### b. Plaintiffs' direct and circumstantial evidence establishes intentional discrimination.

With the correct standard in place, Plaintiffs have shown a strong likelihood of success on their intentional race discrimination claim, which is supported by both direct and circumstantial evidence.

### i. Judge O'Hare's comments are direct evidence of intentional racial discrimination.

Judge O'Hare's comments in an NBC 5 interview on the date he cast the deciding vote to adopt Map 7 are direct evidence of intentional racial discrimination—the very type of statement that the en banc Fifth Circuit explained is "rare[]" in this "day and age." *Veasey*, 830 F.3d at 230. He said: "The policies of Democrats continue to fail Black people over and over and over, but many of them keep voting them in. It's time for people of all races to understand the Democrats are a lost party, they are a radical party, it's time for them to get on board with us and we'll welcome them with open arms." ROA.194. He expressed disapproval for the voting patterns of "Black people" and that it was "time for people of all races" to

"get on board" with his preferred candidates. *Id.*[12] He did this in the context of explaining his vote in favor of Map 7, which reduced from two to one the number of precincts in which minority voters were a majority of eligible voters, and which disproportionately targets Black voters for disenfranchisement in the November 2026 commissioner election. Decreasing the number of majority-minority districts and subjecting Black voters to disproportionate disenfranchisement for an election cycle because the decisionmaker disagrees with who "Black people" choose to elect is as direct of evidence of intentional racial discrimination as can be imagined.[13] *See Personnel Adm'r of Mass v. Feeney*, 442 U.S. 256, 279 (1979) (explaining it is intentionally discriminatory to act "at least in part 'because of,' not merely 'in spite

---

[12] Judge O'Hare's comment is unfortunately not the only recent comment from Tarrant County officials publicly using race to explain political differences. As former Precinct 2 Commissioner Devan Allen testifies, she ran in 2018 in response to the incumbent commissioner announcing at a campaign rally: "If being called a racist is the price I have to pay to preserve America, I am willing to pay 100-fold." Decl. of Devan Allen, ROA.217. And in a 2022 campaign add, Judge O'Hare said "if you're a Republican officeholder and you haven't been called a racist, then you probably haven't done a thing." ROA.76.

[13] The district court faults Plaintiffs for failing to "meet their heavy burden of disentangling race from politics." ROA.669. While this applies the wrong standard, *see supra*, this direct evidence also eliminates this concern. Unlike most redistricting cases, we need not wonder whether officials considered race *or* partisanship in drawing the lines because Judge O'Hare made his use of race plain. Indeed, in *Alexander,* the Supreme Court focused on the need to disentangle race and politics precisely because the Plaintiffs did not present any direct evidence. 602 U.S. at 19; *see also id.* at 9 ("*A circumstantial-evidence-only* case is especially difficult when the State raises a partisan-gerrymandering defense." (emphasis added)).

of,' [] adverse effects upon an identifiable group").

That racial intent—unlawful even if it is just *one* part of the calculus—is constitutionally prohibited even if it is tied to an ultimate partisan political goal. The Supreme Court has repeatedly and emphatically held that the purposeful use of race to achieve partisan goals trades on impermissible racial stereotypes and violates the Equal Protection Clause.[14] The district court faulted Plaintiffs for "suggest[ing] Judge O'Hare was making an unfair racial assumption," because Plaintiffs acknowledge racially polarized voting in their complaint. ROA.673. But it is not Plaintiffs, but the Supreme Court, that disallows such assumptions by state actors, particularly when they underly adverse action: "Where the State assumes from a group of voters' race that they 'think alike, share the same political interests, and will prefer the same candidates at the polls,' it engages in racial stereotyping at odds with equal protection mandates." *Miller v. Johnson*, 515 U.S. 900, 920 (1995) (quoting *Shaw v. Reno*, 509 U.S. 630, 647 (1993)). "Eliminating racial discrimination means eliminating all of it," even when it's a

---

[14] *See Cooper v. Harris*, 581 U.S. 285, 308 n.7 (2017) ("[T]he sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics."); *Easley v. Cromartie*, 532 U.S. 234, 257 (2001) (A legislature may not "defend its districting decisions based on a 'stereotype' about African-American voting behavior"); *Id.* at 266-67 (Thomas J., dissenting) ("It is not [a] defense that the legislature merely may have drawn the district based on the stereotype that blacks are reliable Democratic voters."); *cf. Powers v. Ohio*, 499 U.S. 400, 410 (1991) ("Race cannot be a proxy for determining juror bias or competence.").

convenient proxy. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206, 219–20 (2023) ("We have long held that universities may not operate their admissions programs on the belief that minority students always (or even consistently) express some characteristic minority viewpoint on any issue." (internal quotation marks omitted)) (citing *Shaw v. Reno*, 509 U.S. 630 (1993)).

Such racial stereotyping to achieve partisan goals not only employs unconstitutional assumptions and racial stereotypes, but also impermissibly targets and diminishes minority voting power. Accordingly, the Supreme Court has affirmed that partisan goals do not immunize purposeful attempts to limit minority voting power. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 440 (2006) ("In essence the State took away the Latinos' opportunity because Latinos were about to exercise it. This bears the mark of intentional discrimination that could give rise to an equal protection violation."). Given this unwavering precedent disavowing intentional discrimination based on race—even to serve partisan ends—the district court's handwaving of Judge O'Hare's explicit racial comments because they conform with a "partisan motive," ROA.673.

### ii. The *Arlington Heights* factors also support a finding of intentional racial discrimination.

*First*, it is uncontested that the disenfranchisement borne out of the adoption of Map 7 "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266 (cleaned up); ROA.664 ("[T]he Court acknowledges there is a disparate

impact, in that Black and Latino voters are subject to postponement at higher rates than White voters."). Specifically, while only 5.3 % of eligible White voters are impacted, 17% of eligible Black voters are impacted and 11.8% of eligible Latino voters are impacted. *Id.*[15] Where "the adverse consequences of a law upon an identifiable group" are clear, "a strong inference that the adverse effects were desired can reasonably be drawn." *Id.*; *see LULAC*, 601 F. Supp. 3d at 160 ("[T]he decisionmaker need not explicitly spell outs its invidious goals—a court may sometimes infer discriminatory intent where an act has predictable discriminatory consequences.").

*Second*, the historical context of redistricting of Tarrant County and Texas voting laws supports an inference of discriminatory intent. "In every decade since the statute was passed in 1965, federal courts have held that Texas violated the VRA." *Id.* at 170. "That includes the most recent redistricting cycle and, most

---

[15] In the context of addressing Plaintiffs' Section 2 Voting Rights Act claim (not at issue in this appeal), the district court faulted Plaintiffs for providing "no metric by which the Court can conclude that the disparity between Anglo voters and Black and Latino voters is large or small," ROA.664. While the court's application of *Brnovich v. Democratic National Committee*, 594 U.S. 647 (2021), is inapplicable in this context, it is also hard to imagine *any* metric by which this disparity is small. In terms of proportions, Black voters are three times as likely to be disenfranchised as Anglo voters. And in terms of overall impact, nearly one out of every six Black voters lost their right to vote for the Commissioners Court in 2026 because of this change. By way of comparison, the percentage of voters affected by the challenges in *Brnovich* hovered around 1 percent. *Id.* at 680. These are not thin margins.

damningly, the 2012 decision holding that, among other violations, Texas had engaged in intentional vote dilution by drawing SD 10" in Tarrant County. *Id.*; *see Veasey*, 830 F.3d at 239 (citing the 2012 decision regarding SD 10 in Tarrant County as a "contemporary example[ ] of State-sponsored discrimination").[16] As the *LULAC* court found regarding SD10, the "historical evidence weighs in favor of an inference of discriminatory intent." 601 F. Supp. 3d at 171.

*Third,* the sequence of events, together with the procedural and substantive departures from the norm, support an inference of intentional discrimination.[17] To begin, mid-decade redistricting—unprompted by an unlawful population deviation or a federal or state court order finding a legal violation in the existing map—is certainly unusual, whether nationally, in Texas, or in Tarrant County. ROA.191. Moreover, the absence of any formally adopted redistricting criteria in 2025 notably

---

[16] All three federal judges adjudicating the 2011 congressional map's lawfulness agreed that its configuration of districts in Tarrant County was intentionally discriminatory. *Perez*, 253 F. Supp. 3d at 961; *id.* at 986 (Smith, J., dissenting) (disagreeing with majority regarding other parts of the state but concluding that DFW districts were the product of intentional discrimination); *id.* ("Relatively little about the 2011 Congressional redistricting passes the smell test as to DFW."); *id.* (noting the "unusual appendages added [in a Tarrant County district] from an adjoining, but demographically dissimilar, neighboring county").

[17] As the *LULAC* court noted, these factors "can be difficult to disentangle." 601 F. Supp. 3d at 17. Because Texas open meetings laws limit the potential of "private meetings" of commissioners compared to redistricting by the legislature, Plaintiffs address these factors together here in relation to the "formal, public legislative process." *Id.*

departs from both the 2011 and 2021 Tarrant County redistricting processes, where neutral criteria were adopted to guide the map drawing and selection process. *Id.* at 10, 12, 16. *See Petteway v. Galveston County*, 698 F. Supp. 3d 952, 991 (S.D. Tex. 2023), reversed and remanded on other grounds, 111 F.4th 596 (5th Cir. 2024) (en banc) ("[T]he commissioners court's failure to adopt redistricting criteria . . . is a deviation because the commissioners court had adopted criteria in prior years and other counties across the state have regularly adopted redistricting criteria.").

The 2025 process was also rushed, lasting only two months from start to finish, without any justification or explanation. And there is no explanation for why map options were not publicly posted until just a month before the final vote or why Map 7 was not publicly released until just days before it was selected, contrary to Judge O'Hare's commitment to provide two to two-and-a-half weeks for the public to consider any selected map. *See Petteway*, 698 F. Supp. 3d at 992-93 (finding that COVID pandemic did not explain Galveston County's "rushed process" in which maps were not drawn until just a month before adoption). As was the case in *Petteway*, the failure to publicly release Map 7 until *after* public hearings had completed "prevented meaningful public comment" on the map. *Id.* at 992.

Moreover, the County's failure to undergo a bidding process for outside redistricting counsel—despite choosing not to use Bickerstaff, which had been the County's counsel for the prior four decennial redistricting cycles—was a significant

procedural departure. *Id.* (citing Galveston County's failure to have bids from redistricting counsel as procedural deviation). More startling was PILF's departure from the manner in which Bickerstaff undertook its task. While Bickerstaff managed the public input process and its counsel made substantive legal presentations to both the Commissioners Court and the public, PILF expressly refused to do so, with Mr. Nixon claiming to fear for his life if he attended a public input meeting in majority-minority Precinct 2. ROA.193. As former Commissioner Devan Allen, who attended the meeting, testifies: "This was absurd and insulting to the people of southeastern Tarrant County. It is hard not to see the racial undertone in Mr. Nixon's claim that he would be unsafe if he attended a public input session in a majority-minority community represented by a Black Commissioner." Decl. of Devan Allen, ROA.397.

The sequence of events, together with procedural and substantive departures, support an inference of intentional discrimination.

Rather than addressing this evidence wholistically—as the "sensitive inquiry" under *Arlington Heights* requires—the district court picks apart each piece of circumstantial evidence for being just that, circumstantial, and discounts the relevance of the very factors that *Arlington Heights* identifies. *See e.g.,* ROA.671 (discounting the disparate impact because of the correlation between race and politics), ROA.672 (discrediting the history of discrimination in Tarrant County

redistricting because it was committed by state legislators and the remarks of a Tarrant County commissioner because it was not a *current* commissioner), ROA.663, ROA.672 (quibbling with whether mid-decade redistricting is "exceedingly unusual" or just "not the norm"), and ROA.663-64 (labeling, with no explanation, procedural departures as "indicators of politics—not race discrimination"). This analysis simply does not credit circumstantial evidence but rather demands direct evidence (and then excuses that as well). This Court has admonished that circumstantial evidence must be an adequate pathway to prove intentional discrimination because "neutral reasons can and do mask racial intent." *Veasey*, 830 F.3d at 230. The district court's analysis, in practice, flouts this principle.

### C. Map 7 Unconstitutionally Targets Voters for Disenfranchisement Based on Viewpoint.

But even if Judge O'Hare had not admitted the targeting of "Black voters" because they "keep voting" for his political opponents, and even if this Court discounted the *Arlington Heights* evidence, Defendants' reliance on their "unabashed effort to increase Republican power and decrease Democratic power" is not the saving grace they believe it to be. ROA.489. While the Supreme Court has acknowledged that partisan vote dilution claims are nonjusticiable, it has emphatically *not* permitted legislators to target politically disfavored voters with actual disenfranchisement—temporary or not.

Defendants have admitted that they moved disproportionately Black and Latino

36

voters out of Precinct 2 and into Precinct 1 because they believe those voters are likely Democratic (i.e. viewpoint-disfavored voters) and that the result of those intentional moves is to deprive nearly one in six Black voters in Tarrant County of the opportunity to vote at all in 2026 for the Commissioners Court (and thus to be represented for the next two years by a candidate they had the opportunity to vote for).

The Supreme Court has repeatedly held that "[f]encing out from the franchise a sector of the population because of the way they may vote is constitutionally impermissible." *Carrington v. Rash*, 380 U.S. 89, 94 (1965); *see also Anderson v. Celebrezze*, 460 U.S. 780, 793 (1983) ("[I]t is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status."); *Vidal v. Elst*er, 602 U.S. 286, 293 (2024) (noting that viewpoint discrimination is "particularly egregious form of content discrimination" (cleaned up)). That is precisely what Map 7 does—and what Defendants *claim* it was intended to do. ROA.182 (noting that 66.7% of disenfranchised voters cast ballot for 2022 Democratic gubernatorial candidate versus 47.3% of countywide voters doing so).

It would be patently unconstitutional for the Commissioners Court to declare that 100,000 Democratic voters would be selected, based on their party registration, to be excluded from elections in 2026 and to resume voting in 2028. The Commissioners Court cannot achieve the same result—based on the same explicit

viewpoint discrimination—by smuggling it through an unnecessary redistricting process.

The district court found that this claim is "identical to that in *Rucho*." ROA.666. But that is not so. Nothing in *Rucho* overruled the bedrock principles that legislators cannot fence out from the franchise portions of the population it believes vote the "wrong" way. To the contrary, the Court was clear that even in the context of partisan vote *dilution*—distinct from access to the ballot—it did not "condone excessive partisan gerrymandering" and reiterated that "such gerrymandering is 'incompatible with democratic principles,'" *Rucho*, 588 U.S. at 718-19. Notwithstanding the vote dilution harms of partisan gerrymandering, however, the Court concluded that there were no manageable standards for assessing when such harms are unconstitutional.

But whether a voter is precluded from voting in an election on account of their viewpoint is very different from whether districts are configured to elect more or fewer members of a political party. The latter is not justiciable in federal courts, but the former clearly is. The justiciability problems the Court identified in that case do not arise in answering this question: Can the government target voters for exclusion from the electorate in the next election because it disfavors their viewpoints? It is judicially manageable to say "no" to that without worrying about line drawing. The Supreme Court has done just that: "'(D)ifferences of opinion' may not be the basis for

excluding any group or person from the franchise." *Dunn*, 405 U.S. at 355 (quoting *Cipriano v. City of Houma*, 395 U.S., at 705—706). There is no exception to this rule if the disenfranchisement is "just" for two years.

## II.    Plaintiffs Will Sufferable Irreparable Injury.

Map 7 causes substantial disenfranchisement—disproportionately affecting Black and Latino voters and those whose viewpoints the County disfavors. The right to vote, the right to be free from intentional racial discrimination in voting, and the right to be free from viewpoint discrimination are core constitutional rights. *See* U.S. Const. amend. I, XIV § 1, U.S. Const. amend. XV § 1. Defendants' imposition of Map 7 violates those rights. These harms cannot be undone through monetary relief.

As such, Plaintiffs will suffer irreparable harm absent this Court's intervention. *BST Holdings v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) ("the loss of constitutional freedoms . . . 'unquestionably constitutes irreparable injury'") (quoting *Elrod v. Burns*, 347 U.S. 373 (1976)); *see also, e.g.*, *Deerfield Med. Center v. City of Deerfield Beach*, 661 F. 2d 328, 338 (5th Cir. Unit B Nov. 1981) (finding that violations of fundamental rights are always irreparable); *DeLeon v. Perry*, 975 F. Supp. 2d 632, 663 (W.D. Tex. 2014), *aff'd sub nom. DeLeon v. Abbott*, 791 F.3d 619 (5th Cir. 2015) ("Federal courts at all levels have recognized that violation of constitutional rights constitutes irreparable harm as a matter of law."); *see also League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th

Cir. 2014) ("[O]nce the election occurs, there can be no do-over and no redress.").

### III.    The Balance of Equities Favors Plaintiffs.

The balance of equities also favors entry of a preliminary injunction. *See Ingebretsen v. Jackson Public School Dist.*, 88 F.3d 274, 280 (5th Cir. 1996) (holding that where an enactment is unconstitutional, "the public interest [is] not disserved by an injunction preventing its implementation"). Defendants lack any legitimate interest in enforcing a redistricting plan that violates Plaintiffs' rights to be free from discrimination. *See BST Holdings*, No. 21-60845 *19 (finding that any interest that may be asserted in enforcing laws that infringe on constitutional freedoms is "illegitimate"). And the public interest in protecting Plaintiffs' constitutional rights to be free from discrimination outweighs any minimal burden to Defendants. *See De Leon*, 975 F. Supp. 2d at 665 ("[A] preliminary injunction preventing the enforcement of an unconstitutional law serves, rather than contradicts, the public interest."); *see also*, *e.g.*, *G & V Lounge, Inc. v. Michigan Liquor Control Commission*, 23 F.3d 1071 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."); *Charles H. Wesley Educ. Fdn., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005) ("[T]he . . . cautious protection of the Plaintiffs' franchise-related rights is without question in the public interest.").

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's denial of Plaintiff's motion for preliminary injunction and direct the district court to preliminarily enjoin implementation of Map 7.

Dated: October 14, 2025

Respectfully submitted,

*/s/ Chad W. Dunn*

Mark P. Gaber
MARK P. GABER PLLC
P.O. Box 34481
Washington, DC 20043
(715) 482-4066 Phone
mark@markgaber.com

Chad W. Dunn BRAZIL & DUNN, LLP
1900 Pearl Street
Austin, TX 78705
(512) 717-9822 Phone
(512) 515-9355 Facsimile
chad@brazilanddunn.com

George (Tex) Quesada
Sean J. McCaffity
SOMMERMAN, MCCAFFITY, QUESADA
& GEISLER, L.L.P .
3811 Turtle Creek Blvd, Suite 1400
Dallas, TX 75219
(214) 720-0270 Phone
(214) 720-0184 Facsimile
quesada@textrial.com
smccaffity@textrial.com

Danielle Lang
LANG LEGAL PLLC
6321 Ridge Avenue
Philadelphia, PA 19128

Jesse Gaines
LAW OFFICE OF JESSE L. GAINES
Post Office Box 50093
Fort Worth, TX 76105
817-714-9988 Phone
gainesjesse@ymail.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2025, this document was electronically served on all counsel of record via the Court's CM/ECF system.

*/s/ Chad W. Dunn*
Chad W. Dunn

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT,
TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

1.  This document complies with the word limit of Fed. R. App. P. 32(a)(7) because this document contains 9,568 words which is within the 13,000 word-count limit, excluding the portions exempted by the Rules.

2.  This document complies with the typeface and type style requirements of Fed. R. App. P. 27(d)(1)(E) because the document has been prepared in a proportionally spaced typeface using Microsoft Word Version in Times New Roman 14-point font.

*/s/ Chad W. Dunn*
Chad W. Dunn