No. 25-11055

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

Winnie Jackson; Jarrett "Jay" Jackson; Celina Vasquez; Duane Braxton; Nadia Bhular; Amjad Bhular; Cheryl Mills Smith; Richard Canada,

*Plaintiffs - Appellants*

v.

Tarrant County, Texas; Tarrant County Commissioners Court; Tim O'Hare, In his official capacity as Tarrant County Judge,

*Defendants - Appellees*

**On Appeal from**
United States District Court for the Northern District of Texas

4:25-CV-587

# REPLY BRIEF OF PLAINTIFF-APPELLANTS

Mark P. Gaber
MARK P. GABER PLLC
P.O. Box 34481
Washington, DC 20043

George (Tex) Quesada
Sean J. McCaffity
SOMMERMAN, MCCAFFITY, QUESADA
& GEISLER, L.L.P
3811 Turtle Creek Blvd, Ste. 1400
Dallas, TX 75219

Chad Wilson Dunn
BRAZIL & DUNN, LLP
1900 Pearl Street
Austin, TX 78705

Danielle Lang
LANG LEGAL PLLC
6321 Ridge Avenue
Philadelphia, PA 19128

Jesse Gaines
LAW OFFICE OF JESSE L. GAINES
P.O. Box 50093
Fort Worth, TX 76102

*Counsel for Plaintiffs-Appellants*

# I. TABLE OF CONTENTS

Contents                                                    Page(s)

I. TABLE OF CONTENTS ................................................................................... i
II. TABLE OF AUTHORITIES ............................................................................ ii
III. ARGUMENT .................................................................................................. 1
A. Tarrant County's Adoption of Map 7 Needlessly and Unlawfully Disenfranchises Over 150,000 Texans in 2026. ................................... 1
B. The Constitution Does Not Countenance Disenfranchisement on Partisanship. ........................................................................................ 6
C. Plaintiffs Established Disenfranchisement Based on Race. ............... 7
D. *Purcell* does not bar Plaintiffs' relief. .............................................. 9
IV. CONCLUSION ............................................................................................. 11
V. CERTIFICATE OF SERVICE ..................................................................... 13
VI. CERTIFICATE OF COMPLIANCE ........................................................... 13

## II. TABLE OF AUTHORITIES

**Cases**

*Barnett v. Boyle*,
  250 N.W.2d 635 (Neb. 1977) ..................................................................5
*Brnovich v. DNC*,
  594 U.S. 647 (2021) ..............................................................................2
*Bush v. Gore*,
  531 U.S. 98 (2000) ................................................................................1
*Carrington v. Rash*,
  380 U.S. 89 (1965) .............................................................................5, 6
*Dunn v. Blumstein*,
  405 US. 330 (1972) ..................................................................... *passim*
*Kramer v. Union Free School Dist. 15,* 395 U.S. 621 (1969) ...................6
*Merrill v. Milligan*,
  142 S. Ct. 879 (2022) ................................................................. 9, 10, 11
*Petteway v. Galveston County*,
   111 F.4th 596 (5th Cir. 2024) ................................................................9
*Purcell v. Gonzalez*,
  549 U.S. 1 (2006) ....................................................................... 9, 10, 11
*Republican Party of Oregon v. Keisling*,
  959 F.2d 144 (9th Cir. 1992) .................................................................5
*Rucho v. Common Cause*,
  588 U.S. 684 (2019) ...........................................................................6, 8

**Other**

28 U.S.C. §§ 1291-1292 .............................................................................6
Tex. Const. art. 16, § 64 .............................................................................1
Tex. Const. art. 5, § 18(d) ..........................................................................1

## III. ARGUMENT

### A. Tarrant County's Adoption of Map 7 Needlessly and Unlawfully Disenfranchises Over 150,000 Texans in 2026.

This appeal concerns a straightforward and severe harm: disenfranchisement for an election cycle. Elections for Commissioners occur every four years on a staggered schedule. Tex. Const. arts. 16 § 64 & art. 5, § 18(d). Plaintiffs Duane Braxton, Cheryl Mills-Smith, Richard Canada, Nadia Bhular, and Amjad Bhular were last eligible to vote for commissioner in 2022 and, until the adoption of Map 7, had the right to vote for commissioner in the November 2026 election. ROA.384-393. Now, they do not.

Instead, they will have to wait until November 2028—six years after their last vote for their Commissioner—to have their voice heard. Defendants argue that "Texas' Constitution does not afford a right to elect Commissioners on a specific date." Doc. 64 (hereinafter "Defs. Br.") at 15. But the Texas Constitution *does* set elections for Commissioners on a four-year staggered schedule, Tex. Const. arts. 16 § 64 & art. 5, § 18(d). And "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104–05 (2000). As a result of Map 7, some voters will vote on a four-year cycle, others will vote twice in two years, and over 150,000 will be forced to wait six years.

1

Such unequal disenfranchisement must be justified to withstand constitutional scrutiny. As Plaintiffs explained in their opening brief, Supreme Court precedent applies close scrutiny to outright disenfranchisement (even when it is "temporary"), *see Dunn v. Blumstein*, 405 US. 330, 337 (1972), and a balancing test (referred to as the *Anderson-Burdick* test) to less severe infringements on the right to vote. Doc. 55 (hereinafter "Pls. Br.") at 16-17. Yet, Defendants make no effort to justify this disenfranchisement with any neutral state purpose.[1] Because there is none. Indeed, Defendants do not address *Dunn* or the *Anderson-Burdick* test *at all* (and therefore waive any argument that their actions survive those standards).[2]

Defendants strain to recast Plaintiffs' claims against their 2026 disenfranchisement as asserting a broad "right to not be redistricted." Defs. Br. at 3.

---

[1] In a footnote, Defendants claim that they were facing a "dilemma of whether to keep a racially motivated map." Defs. Br. at 25 n.7. Given Defendants' admission that the redistricting was motivated by an "an unambiguous, explicit and unabashed effort to increase Republican power and decrease Democratic power on the Commissioners Court," ROA.489, this post hac rationalization can easily be dispatched. *See also* Pls. Br. at 22 n.9 ("During the only presentation by Defendants' redistricting lawyer Mr. Nixon to the Commission, when asked if there was anything illegal about the existing map, he responded 'that is not anything I've been hired to provide an answer to.'").

[2] Defendants' brief argues at length about Plaintiffs' Section 2 of the Voting Rights Act claim under *Brnovich v. DNC*, 594 U.S. 647 (2021). Defs. Br. at 20-25. But Plaintiffs specifically did not appeal the preliminary injunction denial on their VRA claim. *See* Pls. Br. at 2 (stating issues on appeal limited to 1st, 14th, and 15th Amendment disenfranchisement claims). Plaintiffs only mention of *Brnovich* in their opening brief is to disclaim its application to this appeal. *See* Pls. Br. at 32, n. 15. The Voting Rights Act is simply not at issue here.

But that is not so. Plaintiffs' disenfranchisement claims would not arise in the context of redistricting absent staggered elections. Nor would they arise in the context of redistricting here if Tarrant County had only moved voters between precincts with the same election schedule. And in an ordinary decennial redistricting cycle, Plaintiffs' disenfranchisement claims would almost certainly fail because Defendants would be able to justify the disenfranchisement based on the governmental interest in staggered elections and the constitutional requirement to equalize population across districts. Plaintiffs' meritorious 2026 disenfranchisement claims arise only because Tarrant County took the novel step of engaging in superfluous politically and racially motivated redistricting even though it *knew* that, given its staggered elections, such redistricting would disenfranchise over 150,000 of its citizens. The scope of this case is narrow. But its importance—in reaffirming the Constitution's commitment to protecting every citizen's direct access to the ballot regardless of politics or race—is vital.

Defendants repeat their argument below that Plaintiffs are not disenfranchised because they "can still vote for every precinct, district, State, and federal election for which they are eligible on the date of that election." Defs. Br. at 12. But, as Plaintiffs explained in their opening brief, Pls. Br. at 18 n.6, the Plaintiff in *Dunn v. Blumstein,* 405 US. 330, 337 (1972)—the landmark case striking down durational residency requirements—was able to vote in every election for "which they [were] eligible"

3

too. The constitutional violation was in the government's engineering of eligibility to deprive disfavored voters of access to the ballot box, even if for just one election. Defendants provide no answer.

In their opening brief, Plaintiffs also explained that Defendants' theory—that disenfranchisement that arises from redistricting is no harm at all, Defs. Br. at 12—would countenance *permanent* disenfranchisement of some residents so long as it was achieved by repeated acts of redistricting. Defendants say "[t]hose are not the facts of this case." Defs. Br. at 14. Not yet. But this is, again, no answer to the fatal flaw in their theory of Plaintiffs' harm. Defendants do not explain how many times Plaintiffs would need to be disenfranchised before they would have a "cognizable claim." Defs. Br. at 11.

The residency requirement cases are analogous and instructive here. In *Dunn*, the Supreme Court recognized the State had an interest in preventing fraud and imposing a registration (and thus residency) deadline that would allow it sufficient time to verify bona fide residence. 405 U.S. at 345-49. Undoubtedly, in *Dunn*, Tennessee's 30-day deadline for registration created some disenfranchisement for brand new residents. But *that* more tailored disenfranchisement was justified by the requirements of election administration. Likewise, when disenfranchisement ordinarily occurs at the intersection of redistricting and staggered elections, it is usually upheld as an administrative necessity justified by the requirements of equal

4

population and the state interests in staggering elections. *See* Pls. Br. at 19-21 (collecting cases).

But this is not one of those cases. Just as *Dunn* did not countenance even temporary disenfranchisement on new residents for the purposes of fencing out voters of a "different interest," 405 U.S. at 355, the Constitution does not allow legislators to use the device of redistricting and staggered elections to discriminate against and disenfranchise disfavored voters. Pls. Br. at 19-21 (collecting cases affirming that discriminatory disenfranchisement through redistricting would be unlawful).[3] Defendants put forward no election administration rationale for their actions. While they assert that "[t]he use of staggered elections is a rational component of election administration," Defs. Br. at 13, Plaintiffs do not challenge the use of staggered elections but rather Defendants choice to engage in a superfluous swapping of voters between districts. And while Defendants assert that Plaintiffs' disenfranchisement is the "unavoidable consequence of redistricting a

---

[3] Defendants suggest that these cases require proof of racial intent. Defs. Br. at 13. Of course, Plaintiffs did establish racial discrimination. *See* Pls. Br. at 28-36. But these cases are not nearly so narrow. Rather, they upheld maps resulting in temporary disenfranchisement only when they made "*no* invidious discrimination between classes of voters," *Barnett v. Boyle*, 250 N.W.2d 635, 638 (Neb. 1977), or did not "unduly burden a particular group," *Republican Party of Oregon v. Keisling*, 959 F.2d 144, 145-46 (9th Cir. 1992). Defendants admit that their actions *intentionally* burden Democratic voters. ROA.489. And fencing out voters from an election on the basis of political viewpoint is no doubt invidious. *See Carrington v. Rash*, 380 U.S. 89, 94 (1965). Defendants provide no answer.

5

jurisdiction with a staggered election cycle," Defs. Br. at 12, this redistricting was far from "unavoidable."[4]

### B. The Constitution Does Not Countenance Disenfranchisement on Partisanship.

Defendants devote less than one page of argument to Plaintiffs claim that they have been subjected to disenfranchisement based on their political viewpoint.[5] Perhaps that is because they admit that is the case. ROA.489.

Defendants' only argument is that Plaintiffs' First Amendment claim seeks to relitigate *Rucho v. Common Cause*, 588 U.S. 684 (2019), a case finding that *vote dilution* partisan gerrymandering claims are nonjusticiable because they lack judicially manageable standards. But this is, as Plaintiffs explained, not a vote dilution case. This case is not *Rucho* but rather it is *Carrington v. Rash,* 380 U.S. 89 (1965), *Kramer v. Union Free School Dist. 15,* 395 U.S. 621 (1969), and *Dunn v.*

---

[4] Defendants argue that Tarrant County is "not required to conduct its redistricting only after the national census." Defs. Br. at 23. True enough. The point is that the need to resolve malapportionment is the typical justification for temporary disenfranchisement in this context. That is not the case here and Defendants put forward no other neutral justification.

[5] Defendants suggest that the district court's dismissal of Plaintiffs' First Amendment claim—rather than just its denial of the preliminary injunction on this ground—is on appeal here. Defs. Br. at 2, 11. A partial denial of a motion to dismiss is not an appealable order, *see* 28 U.S.C. §§ 1291-1292 and this Court does not have jurisdiction to affirm the motion to dismiss at this stage in the litigation (although plainly this Court, by addressing the merits of Plaintiffs' First Amendment claim, will speak to this issue as well).

*Blumstein*, 405 U.S. 330—all cases where the Supreme Court disapproved of disenfranchisement based on legislators' disapproval of certain voters' assumed viewpoints. *Rucho* did not create a legislative super-right to partisan gerrymander even when doing so results in the direct disenfranchisement of voters rather than vote dilution. *Rucho* has no bearing here and Defendants provide no other response.

### C. Plaintiffs Established Disenfranchisement Based on Race.

Defendants defend the district court's application of the racial gerrymandering "predominance" standard to Plaintiffs' intentional race discrimination disenfranchisement claim by continuing to muddle both intentional discrimination and racial gerrymandering claims and vote dilution and direct disenfranchisement standards. For example, Defendants describe Plaintiffs' claim as "race-based vote dilution" and argue "[t]he district court properly did not impose an incorrect pre-*Shelby County* standard." Defs. Br. at 17-18. But, of course, this is not a vote dilution appeal (as Defendants seem to acknowledge later, *id.* at 20) and *Shelby County* and the Section 5 retrogression standard have nothing to do with this case. Defendants accuse Plaintiffs of an "inability 'to articulate their theory of harm without making an allegation of racial gerrymandering," Defs. Br. at 19, but do not explain what is inarticulate about Plaintiffs' claim of disenfranchisement in the 2026 elections. And

7

Defendants, like the district court, seem to ignore the existence of an intentional race discrimination claim at all:

> Appellants claim that Tarrant County "intentionally subjected a disproportionate number of Black and Latino voters to disenfranchisement in the 2026 election cycle as part of a scheme to minimize their political power." However, as the district court held, slight disparate impacts do not create a federal cause of action.

Defs. Br. at 19-20. But as Defendants' own description explains, the claim is not a "slight disparate impact" but intentional discrimination. The district court clearly erred in applying the racial gerrymandering "predominance" standard to such a claim. Pls. Br. at 26-27.

Finally, in responding to Plaintiffs' evidence of intentional discrimination, Defendants largely just parrot the district court's discounting of circumstantial evidence. Defs. Br at 29-31; Pls. Br. at 32-36. And, with respect to Judge O'Hare's acknowledgment that Black voters were targeted for their continued support of Democratic candidates, Defendants repeat the district court's error of excusing the targeting of Black voters so long as it is in furtherance of a partisan goal. Defendants argue that Plaintiffs "cannot ascribe a racial motive to Judge O'Hare's comments when it "evidenced an explicitly partisan motive" and that Judge O'Hare's specific reference to the race of the voters targeted is acceptable because it "tracked precisely Appellants' assumptions about cohesive voting patterns of minority voters." Defs. Br. at 40. This argument just asserts—contrary to decades of Supreme Court

8

precedent—that legislators can target voters by race if their ultimate objective is partisan. While incidental racially disparate impacts of partisan gerrymandering are not actionable, *intentional* targeting of voters by race to achieve partisan goals is always unconstitutional. Pls. Br. at 30-31; *cf. Petteway v. Galveston County,* 111 F.4th 596, 612 (5th Cir. 2024) (criticizing "divisively counting citizens by race and ethnicity"). Once again, Defendants do not respond to the avalanche of caselaw establishing as much.

### D. *Purcell* does not bar Plaintiffs' relief.

Defendants argue, glancingly, that *Purcell v. Gonzalez*, 549 U.S. 1 (2006)[6] counsels against granting Plaintiffs' relief in this case. Defs. Br. at 4. Not so. The general election remains over a year away and Defendants cite *no* case applying *Purcell* on a similar timeline. In *Merrill v. Milligan*, 142 S. Ct. 879 (2022), the Supreme Court stayed an injunction issued just over *one month* before the relevant primary. Here, the primary remains four and a half months away.

Both Plaintiffs and the judiciary have worked expeditiously to ensure the adjudication of Plaintiffs' claims without creating *Purcell* problems.[7] On June 3, the

---

[6] *Purcell* is typically cited for the general proposition that "federal courts ordinarily should not enjoin state election laws in the period close to an election." *Merrill v. Milligan*, 142 S. Ct. 879 (2022) (Kavanaugh, J., concurring).

[7] Defendants have repeatedly opposed expedited review of these claims.

9

Commissioners' Court approved Map 7. One day later, Plaintiffs filed suit and shortly thereafter submitted their motion for preliminary injunction alongside a motion to expedite. ROA.14, 141, 177. The district court issued its ruling expeditiously and Plaintiffs filed their appeal the next business day. ROA.652, 675. Plaintiffs sought an expedited schedule before this Court as well and this Court obliged, providing for swift briefing and oral argument, all of which will conclude over a year from the general election and still six weeks before even the candidate filing date. Because of the judiciary's expeditious review of Plaintiffs' claims, *Purcell* imposes no barrier to relief.

Even if this case was close enough to an election to invoke the cautions of *Purcell* (it is not), the relevant factors all still weigh in favor of granting Plaintiffs' relief: the constitutional principles barring both viewpoint and race discrimination in access to the ballot are well-established; Plaintiffs have plainly not delayed seeking relief (but rather have acted with great urgency); the harm alleged—loss of the right to vote in 2026—can have *no* remedy after this election cycle; and simply maintaining the map that has been in effect since 2011 is plainly feasible without undue cost or confusion. [8] *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). To

---

[8] Here, unlike the vast majority of redistricting cases (including *Merrill*), there is no need for the creation of a remedial map because the predecessor map is not malapportioned and therefore, the status quo can be maintained. As Justice Kavanaugh has opined, the application of *Purcell* depends "in part on the nature of the election law at issue, and how easily the State could make the change without

apply *Purcell* here, where the Plaintiffs' complaint was filed sixteen months before the relevant general election and one day after the governmental action would be to stretch *Purcell* beyond recognition.

## IV.   CONCLUSION

For the foregoing reasons, this Court should reverse the district court's denial of Plaintiff's motion for preliminary injunction and direct the district court to preliminarily enjoin implementation of Map 7.

---

undue collateral effects." 142 S. Ct. at 881, n.1. Here, where the challenge is not to a statewide practice, but a single county map, the implementation is necessarily less onerous. But more importantly, it will take little effort to simply revert to the map in use for many prior election cycles. And maintaining the same map as last election cycle is likely to *avoid*, not create, voter confusion.

11

<table>
<tr><td>

Dated: October 24, 2025

Mark P. Gaber
MARK P. GABER PLLC
P.O. Box 34481
Washington, DC 20043
(715) 482-4066 Phone
mark@markgaber.com

George (Tex) Quesada
Sean J. McCaffity
SOMMERMAN, MCCAFFITY, QUESADA
& GEISLER, L.L.P.
3811 Turtle Creek Blvd, Suite 1400
Dallas, TX 75219
(214) 720-0270 Phone
(214) 720-0184 Facsimile
quesada@textrial.com
smccaffity@textrial.com

</td><td>

Respectfully submitted,

*/s/ Chad W. Dunn*

Chad W. Dunn
BRAZIL & DUNN, LLP
1900 Pearl Street
Austin, TX 78705
(512) 717-9822 Phone
(512) 515-9355 Facsimile
chad@brazilanddunn.com

Danielle Lang
LANG LEGAL PLLC
6321 Ridge Avenue
Philadelphia, PA 19128
(267) 205-0578 Phone
Lang.danielle@gmail.com

Jesse Gaines
LAW OFFICE OF JESSE L. GAINES
Post Office Box 50093
Fort Worth, TX 76105
817-714-9988 Phone
gainesjesse@ymail.com

</td></tr>
</table>

## V. CERTIFICATE OF SERVICE

I certify that on October 24, 2025 the foregoing document was electronically served on all counsel of record via the Court's EM/ECF system.

*/s/ Chad W. Dunn*

## VI. CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f), and 5th CIR. R32.1: this document contains 2,682 words.

2. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because:

this document has been prepared in a proportionally spaced typeface using Microsoft 365 for Business version 2509 in Times New Roman 14. Pt.

*/s/ Chad W. Dunn*